

*Accident Reconstruction Services*

# National Collision Technologies, Inc.

## ACCIDENT RECONSTRUCTION REPORT

Jeremy Farris

v.

Brian Dana Jefferson, Michael Bishop, and National Liability and Fire Insurance
Company

NCTI File Number: NC061218

### PREPARED FOR:

Jason Welborn
Attorney at Law
617 Buchanan Street,
Lafayette, Louisiana, 70501

*National Collision Technologies, Inc.  · PO Box 14953 · Baton Rouge, LA 70898*
*Phone (225) 924-7756 · Fax (225) 924-7762 · www.nctigroup.com*



*Accident Reconstruction Services*

National Collision Technologies, Inc.
PO Box 14953
Baton Rouge, Louisiana 70898-4953

Phone:   (225) 924-7756
Fax:      (225) 924-7762
Web:     www.nctigroup.com

March 25, 2020

Jason Welborn
Attorney at Law
617 Buchanan Street
Lafayette, Louisiana, 70501

      Case Re:     Jeremy Farris v. Brian Dana Jefferson, Michael Bishop, and National
                       Liability and Fire Insurance Company
                       US District Court, Western District of Louisiana, Lafayette Division
                       Civil Action No. 6:19-cv-108
                       Date of Accident: June 12, 2018
                       NCTI File: NC061218

Dear Mr. Welborn

Thank you for your assignment to our firm on January 13, 2020.   NCTI has conducted an analysis
of the traffic collision in the above referenced matter.   The information reviewed to form the basis
of our conclusion includes:

- Lafayette City Police Department Crash Report
- Provided Photographs and Video
- Deposition of Officer Adam Bradford, February 13, 2020
- Deposition of Alyssa Landry, February 13, 2020
- Deposition of Jeremy Ray Farris, February 13, 2020
- Deposition of Stacy Bishop, February 13, 2020
- Deposition of Alviray Williams, February 13, 2020
- Complaint
- Scheduling Order
- Traffic Control Plan
- Answer by Michael Bishop and National Liability & Fire Insurance Company
- Answer by Brian Dana Jefferson
- Answers to 1st Set of Interrogatories and Responses to 1st Requests for Production of
  Documents Propounded by Defendants, Michael Bishop and National Liability & Fire
  Insurance Company
- Answers to 2nd Set of Interrogatories and Requests for Production of Documents
  Propounded by Defendants, Michael Bishop and National Liability & Fire Insurance
  Company

1

- Drug and Alcohol Testing Forms for Mr. Farris
- Louisiana Revised Statutes
- Arkansas Commercial Driver License (CDL) Manual
- Commercial Vehicle Preventable Accident Manual (CVPAM)
- Jacobs Engine Brake Operator's Manual
- Northwestern University Traffic Crash Reconstruction
- Site Research, Google Aerial, and Street Views
- Vehicle Research
- NHTSA Vehicle Database
- NAVO Database
- NCTI Calculations

The subject collision occurred on June 12, 2018 at approximately 1:21pm on Interstate 10 East, 0.5 mile west of Louisiana Ave. in Lafayette, LA. The collision was investigated by Officer Alyssa Landry of the Lafayette City Police Department who reported the weather conditions were dry, clear, daylight and that the accident occurred in a work zone.

I-10 East is a two-lane, straight-level, asphalt roadway with lanes measuring approximately 11 - 12ft wide. At the time of the accident, it was divided from the westbound direction by a construction zone median approximately 60ft wide. The through lanes are separated by white dashed lines and bordered by a solid white fog line on the right and a solid yellow fog line on the left. There was a paved shoulder approximately 10ft wide on the right and a concrete barrier on the left. The speed limit was 60mph in the construction zone. Prior to the construction zone the speed limit was 70mph. See Figures 1 and 2.



**Figure 1: Aerial photograph from Google Earth**

2



Figure 2: Google Street View, I-10 East

## POLICE REPORT

Two vehicles were involved:

1. A dump truck, specifically a 2003 International 5600i, driven by Jeremy Ray Farris (Louisiana Class A License), age 31, for Ray's Construction, LLC.

2. An 18-wheeler, specifically a 2000 Peterbilt 379 towing a box trailer, driven by Brian Dana Jefferson (Arkansas Class A License), age 46, for Bishop Trucking.

According to Officer Landry's report, Mr. Farris stated he was coming out of a construction area in the center median and turned into the left lane of I-10 East. He did not see Mr. Jefferson, but was rear ended by him after traveling some time.

Mr. Jefferson was traveling in the left lane on I-10 East and Mr. Farris turned into his lane from a construction zone. He could not avoid Mr. Farris' dump truck and collided with the back of it.

Officer Landry noted that body cameras were active in the investigation, no injuries were reported on scene, and Mr. Farris was issued a citation for "failure to yield from a private road", LA RS 32:124[1].

---

[1] Vehicle entering highway from private road, driveway, alley or building, LA RS § 32:124 (1962)

Officer Landry reported that Mr. Farris' dump truck had "minor" damage to the rear.  There was no reported skid mark data or distance traveled after impact for Mr. Farris and he was listed as having no injury.  Mr. Farris was reported as having the following contributing factors: no vision obscurements, a normal driver condition, and a violation of "failure to yield".

Officer Landry reported that Mr. Jefferson's 18-wheeler had "moderate/severe" damage to the front.  There was no reported skid mark data or distance traveled after impact for Mr. Jefferson and he was listed as having no injury.

Officer Landry's report included a Not-To-Scale diagram.  See Figure 3.



**Figure 3: Police Report Diagram**

**DEPOSITIONS**

Officer Adam Bradford testified in a deposition on February 13, 2020, that:
- He is currently a Lafayette Police Department Corporal, in the narcotics section.
- He was Officer Landry's training officer and was on scene during the investigation.
- He has no independent recollection of the day but did review his body camera footage.
- He doesn't have any information to dispute what is in the report.
- The driver of the dump truck was leaving a construction zone in the median of I-10.
- It was that driver's responsibility to ensure that it was clear to enter the travel lane.
- Mr. Farris failed to yield when turning out of the construction zone.
- Mr. Farris initially told them he saw a silver car and did not see the 18-wheeler.
- The accident occurred in a construction zone, with a 60mph speed limit.
- If Mr. Jefferson was exceeding that speed limit, it would be important to their investigation.
- There were signs saying trucks should travel in the right lane.
- He doesn't know if it's a violation that they would enforce.
- He agrees that traffic should be in the right lane unless passing.
- He doesn't remember watching the dash cam.

Alyssa Landry testified in a deposition on February 13, 2020, that:
- She is currently a dispatcher and previously a patrol officer.
- She was in training at the time of the accident.
- They listed a violation of failure to yield for Mr. Farris because he didn't wait until traffic was clear before he proceeded onto the interstate.
- They didn't take any measurements or look for skid marks, just interviewed the drivers.
- They didn't find anything that the Mr. Jefferson did that contributed to the accident.
- Mr. Farris saw a silver car and pulled out because he thought the lane was clear and he didn't see Mr. Jefferson's 18-wheeler.
- The drivers had already moved away from the area of impact.
- They didn't suspect any alcohol or drug use.
- She doesn't remember watching the dash cam.
- There was road construction at the time of the accident.
- The speed limit was reduced from 70 to 60mph.
- She isn't sure if Mr. Jefferson exceeding the speed limit would affect their investigation.
- Mr. Jefferson was traveling straight the other driver should have yielded to him.
- If the Mr. Jefferson's speed was excessive, it would factor in.
- Speeding is a violation of Louisiana Law.
- She is not sure he would have been cited, depends on how fast he was going.
- Louisiana law requires traffic to stay in the right lane unless executing a passing maneuver.
- There were signs requiring 18-wheeler commercial trucks to use the right lane.
- If Mr. Jefferson was in the left lane for a while, it would have affected their investigation.

Jeremy Ray Farris testified in a deposition on February 13, 2020, that:

- He has reviewed the dash cam video from the tractor/trailer.
- He has not seen the body cam videos from the police officers.
- Before the accident, he had a LA Class A Commercial Driver's License.
- He had it for 4 years.
- He currently has a personal driver's license; he couldn't pass the physical after the accident.
- At the time of the accident, he had just dumped his load and his truck was empty.
- His truck had an automatic transmission.
- He did a pre-trip inspection that morning and noted no problems; he didn't fill out a form.
- In CDL training, he was taught he should have 10 to 15 seconds of clearance to accelerate.
- In CDL training, he was taught when exiting from a construction zone they must yield, make sure nothing is coming, not pull out in front of anyone.
- It takes 2-3 times the length of a tractor-trailer to stop, longer than for a car to stop.
- Slowing and stopping a tractor-trailer requires putting your foot on the brake and shifting gears if it has a manual transmission.
- He was not on any illegal drugs and had not drank alcohol 8 hours before the accident.
- He was not on his cell phone at the time of the accident.
- Traffic was light and he does not know how fast cars were moving.
- He was in the construction zone median and pulled out onto I-10 E/B towards Baton Rouge.
- There were concrete barriers with spaces for construction vehicles to go through.
- He was at a complete stop before he pulled onto the interstate.
- His path to enter the interstate was not at a 90° turn with the interstate.
- He waited until it was clear, a silver car passed and he got into the left lane
- He knew he had 10 to 15 seconds of clearance to accelerate.
- He doesn't know how long it takes the dump truck to get to 60 or 70mph.
- He saw Mr. Jefferson's tractor-trailer more than 10 seconds before the impact.
- He had his foot all the way down on the accelerator when he noticed the tractor-trailer.
- He does not know how long he traveled before impact.
- He was going 30-35mph when he was hit.
- He pulled over after the accident.
- He underwent drug and alcohol testing after the accident; no drugs or alcohol in his system.
- He does not know if his truck had any GPS data or dash camera video.


Alviray Williams testified in a deposition on February 13, 2020, that:

- She owns Ray's Construction with her husband, Ray Winters.
- They hired Jeremy Ray Farris to drive the truck to and from job sites and deliver material.
- Mr. Farris had been working for them for a week; they had not had any problems with him.
- She did the pre-employment interview and saw his class A license.
- Her husband went on a test drive with Mr. Farris before they hired him.
- They didn't call any of Mr. Farris' previous employers.
- Mr. Farris did not return to work for Ray's Construction after the accident.
- They tested Mr. Farris for drugs and alcohol prior to employment; it was negative.
- Their company policy is no cell phones while driving.

- There were no mechanical problems with the truck prior to the accident.
- Mr. Farris called her and reported that he was in an accident.
- She went to the scene and doesn't think the police officers were there yet.
- Mr. Farris said that he was leaving the construction zone and turning onto I-10 East.
- He said he looked, a silver car passed, he got on I-10 East and was then hit from behind. Mr. Farris said he wasn't using his cell phone.
- She also spoke to Mr. Jefferson and he said Mr. Farris turned onto I-10 East.
- Mr. Jefferson told her that he tried to slow down but couldn't.
- Mr. Jefferson let her watch his dash cam video and it showed him in the left lane, speeding.
- Right before impact, Mr. Jefferson's speed was into the 60's.
- When he made impact, it was down to around 35mph.
- The dump truck had GPS tracking but she doesn't think it was working.
- They tested Mr. Farris for drugs and alcohol after the accident; it was negative.
- She didn't take any photos at the scene but later took two photos of the dump truck.
- She doesn't remember the damages, something underneath the truck needed to be repaired.
- They sold the dump truck.

Stacy Bishop testified in a deposition on February 19, 2020, that:
- She and Mike Bishop created Bishop Trucking, sole proprietor in 2002.
- The company is listed as Michael T. Bishop doing business as Bishop Trucking.
- She and her husband own the trucks and trailers together.
- They had purchased the 2000 Peterbilt 379 in January 2018 but no longer own it.
- Her husband is a CDL driver; she is not.
- She is the operations manager, keeps records, takes driver applications, does most of the paperwork and filings, does the tags and takes care of insurance.
- She is responsible for documenting the maintenance.
- They did not have GPS or trackers or locators.
- They interviewed Mr. Jefferson, but already knew him through family.
- They tested his driving ability.
- They understood that drug testing was only required in an accident with injury.
- Mr. Farris told Mr. Jefferson that he was fine so they thought testing was unnecessary.
- Mr. Jefferson was pulled for a random drug test about nine days later.
- There was a video they reviewed with Mr. Jefferson; that was the only investigation.
- She talked to Mr. Jefferson the day of the accident; asked if he was okay and if he needed to go to the hospital.
- She saw that Mr. Jefferson was speeding; he was not under any time pressure.
- There had been no prior problems and they did not reprimand Mr. Jefferson.
- They do not have any operations manuals.
- The Peterbilt was repaired; afterward they hauled a load in October 2018 and then sold it.
- They were in compliance with the Federal Motor Carrier Safety Act.

## VEHICLES

NCTI did not have the opportunity to inspect either of the vehicles and has not received any photographs of the damages other than what is depicted in the footage from Mr. Jefferson's dash camera and the investigating officers' body cameras.  This body camera footage depicts minor damage to the rear of the dump bed of Mr. Farris' Dump Truck and to the front grille of Mr. Jefferson's 18-Wheeler.  This damage is consistent with a rear-end collision at a low closing speed. See Figures 4 and 5.



**Figure 4: Mr. Farris' Dump Truck from Body Camera Footage**



**Figure 5: Mr. Jefferson's 18-Wheeler from Body Camera Footage**

**SITE**

NCTI did not have the opportunity to inspect the accident location and has not received any photographs taken of the scene other than what is depicted in the footage from Mr. Jefferson's dash camera and the investigating officers' body cameras.  NCTI did review excerpts (sheets 94 to 99) from the Louisiana Department of Transportation (LA DOTD) "Final Plan" for the "Suggested Sequence of Construction" for a section of I-10.  This included plans to place warning signs along I-10 East including "Road Work Ahead," "Speed Limit XX," "Left Shoulder Closed," and "Begin Higher Fines Zone".  See Figures 6 through 9.



**Figure 6: LA DOTD Sheet 94**



**Figure 7: LA DOTD Sheet 95**



**Figure 8: LA DOTD Sheet 96**



**Figure 9: LA DOTD Sheet 98**

Based on Google Aerial and street views, there was a clear sightline in the area.  NCTI determined that an eastbound vehicle should be able to see the gap that Mr. Farris' dump truck pulled out of from approximately 2400ft away (nearly half a mile).  See Figure 10.



**Figure 10: Sightline Measurement from Google Aerial**

## ANALYSIS

NCTI received approximately 3 minutes of **dash camera video from Mr. Jefferson's** 18-wheeler, date stamped 6/12/18 with a time ranging from 1:11:30pm to 1:14:29pm.  The video included an overlay of GPS coordinates, speed data and a logo identifying a Garmin brand camera.

The video starts with Mr. Jefferson traveling 67mph in the left lane of I-10 East while passing signs for Exit 103A-B, I-49 and US Hwy 167 to Morgan City and Opelousas.  As he continues east bound, Mr. Jefferson passes numerous construction warning signs, consistent with the LA DOTD plans.  See Figures 11 through 22.



**Figure 11:**
**Speed = 67mph**



**Figure 12:**
**Speed = 71mph**



**Figure 13:**
**Speed = 70mph**

14



**Figure 14:**
**Speed = 63mph**



**Figure 15:**
**Speed = 63mph**

15



**Figure 16:**
**Speed = 63mph**



**Figure 17:**
**Speed = 63mph**



**Figure 18:**
**Speed = 64mph**



**Figure 19:**
**Speed = 65mph**

At 1:12 PM, about one minute before the accident, Mr. Jefferson passes a sign restricting trucks to use the right lane only.



**Figure 20:**
**Speed = 66mph**



**Figure 21:**
**Google Street View at Above Location**



**Figure 22:**
**Speed = 63mph, Approximately Half a Mile from Entrance Gap**

At 1:13:04 PM, Mr. Farris' Dump Truck can be seen entering the left lane from the center median barrier opening within the construction zone.  A silver vehicle in the right lane can be seen passing the barrier opening where Mr. Farris began his entry onto the left lane, consistent with Mr. Farris' testimony that a silver car passed by before he started turning.  See Figure 23.



**Figure 23:**
**Dump Truck Enters I-10, 11.5sec before Impact, 67mph**

Two seconds later, at 1:13:06 PM, Mr. Jefferson is going 67mph when he begins reducing his speed as indicated on the video display as well as the audio recording that captures the loud exhaust noise typical of a Compression Release Engine Brake, or Jake Brake.  See Figures 24 and 25.



**Figure 24:**
**18-Wheeler Begins Braking, 9.5sec before Impact, 67mph**



**Figure 25:**
**18-Wheeler during Braking, 5.0sec before Impact, 57mph**

Approximately 9.5sec after Mr. Jefferson began reducing his speed from 67mph, at 1:13:15 PM Mr. Jefferson impacts the rear of Mr. Farris' dump truck at 35mph.  See Figure 26.



**Figure 26:**
**Impact, 35mph**

Shortly after impact, Mr. Jefferson and Mr. Farris bring their vehicles to a stop on the right shoulder of I-10 East.  See Figure 27.



**Figure 27:**
**Vehicles at Rest after Impact**

21

**Analysis**

The time-distance relationship of the two vehicles was determined based on analysis of the dash camera video and calculations. Impact occurred approximately 11.5sec after Mr. Farris had entered the left travel lane traveled approximately 270ft reaching a speed of approximately 32mph. Mr. Farris' average acceleration rate was 0.13g, normal for an unloaded dump truck, and his speed at impact was 32mph. This is consistent with Mr. Farris' testimony that he was traveling at 30-35mph at impact. Mr. Jefferson, going 67mph, was approximately 655ft away when Mr. Farris began entering I-10. See Figure 28.



**Figure 28:**
**Video Analysis CAD**

Mr. Jefferson's dash camera video shows that he gradually slowed from 67mph to 35mph in 9.5sec while traveling approximately 712ft, which equates to a braking rate of only 0.15g, (lower than a normal value 0.2g). This low rate of speed reduction, combined with the audible recording of the loud engine exhaust noise, suggests that Mr. Jefferson only applied the Jake Brake, (a component installed on diesel engines that releases stored, compressed air from the cylinder at the top of the piston's stroke, preventing it from returning it's energy to the crankshaft and powering the down-stroke, slowing the vehicle as the air is compressed). Many drivers prefer to use only the Jake Brake as they extend the life of service brake shoes and prevent them from overheating.[2]

---

[2] Jake Brake – What Is It, and How Do You Use It?  Trucking Truth, https://www.truckingtruth.com/wiki/topic-91/jake-brake (March 17, 2020)

According to the Jacobs Engine Brake Operator's Manual[3]:

- The Jacobs Engine Brake is a vehicle-slowing device, not a vehicle-stopping device.  It is not a substitute for the service braking system.  The vehicle's service brakes must be used to bring the vehicle to a complete stop.
- On vehicles equipped with electronic engine controls, the controls will deactivate the engine brake when engine speed falls below approximately 1000 rpm or when the vehicle slows down to a pre-set speed.  This will vary depending on the vehicle and engine configuration and is intended to prevent the engine from stalling.

The audio recording from Mr. Jefferson's dash camera reveals that the loud exhaust noise associated with Jake Brake applications stopped shortly before impact.  This suggests that the system deactivated when it reached a certain rpm or speed, as designed.

Had Mr. Jefferson simply applied the service brake, (brake pedal) in lieu of improperly relying on the Jake Brake, a normal application of braking (0.21g) would have enabled him to come to a complete stop within the same distance that he actually traveled.  Alternatively, applying the brake pedal at an even lesser rate than normal, (0.16g), would have enabled Mr. Jefferson to reduce his speed to match that of Mr. Farris, 32mph, and no impact would occur.

Mr. Jefferson ignored several signs as he entered and traveled within the construction zone that included a speed limit reduction from 70mph to 60mph, as well as a sign directing that trucks use the right lane only.  Mr. Jefferson's dash camera video depicts him traveling at 67mph in the left lane.

According to the police report and his Driver's License Report, Mr. Jefferson had an Arkansas Class A commercial driver's license.  According to the Arkansas CDL manual[4]:

- *Of all the space around your vehicle, it is the area ahead of the vehicle – the space you're driving into – that is the most important.*
- *According to accident reports, the vehicles that trucks and buses most often run into is the one in front of them.*
- *A hazard is any road condition or other road user (driver, bicyclist, pedestrian) that is a possible danger.*
- *You will have more time to act if you see hazards before they become emergencies.*
- *When people are working on the road, it is a hazard.*
- *Workers and construction vehicles may get in the way.*
- *Drive slowly and carefully near work zones.*
- *Parked vehicles can be hazards.*
- *They may suddenly start up and drive into your way.*
- *Motorists who fail to maintain normal speed are hazards.*
- *Seeing slow moving vehicles early can prevent a crash.*

---

[3] Jacobs Vehicle Systems. (2015). *Jacobs Engine Brake Operator's Manual* Bloomfield, CT.  Pages 3-4.
[4] American Association of Motor Vehicle Administrators. (2005). "Section 2: Driving Safely," and "Section 5: Air Brakes," *Model Commercial Driver's License Manual*.  Pages 2-16, 2-17, 2-18, 2-19, 2-20, 2-21, 5-8.

- *You should always be looking for hazards.*
- *When you see a hazard, think about the emergencies that could develop and figure out what you would do.*
- *Always be prepared to take action based on your plans.*
- *If somebody pulls out in front of you, your natural response is to hit the brakes.  This is a good response if there's enough distance to stop, and you use the brakes correctly.*

According to the Commercial Vehicle Preventable Accident Manual (CVPAM) [5]:
- *Learn to recognize driving situations that can be hazardous.*
- *Adjust speed, position, direction and attention to be able to maneuver safely if a hazard develops.*
- *Scan far enough ahead to be able to react safely to approaching situations.*
- *The most important rule in lane usage is to maintain a safe following distance.  Use any method you feel comfortable with.*
- *Try to scan ahead of what is immediately in front of you.*

According to Louisiana Revised Statute (LA RS) 32:71 [6], "Driving on right side of road; exceptions,"

> *Upon all multilane highways, no vehicle shall be driven in the left-hand lane except when directed otherwise, preparing for a left turn at an intersection or private road or driveway, overtaking or passing another vehicle proceeding in the same direction, or when right-hand lanes are congested; however, no vehicle being driven in the left lane except when directed otherwise or preparing for a left turn at an intersection, private road, or driveway shall impede any other vehicle that is traveling in the same lane and behind that vehicle.*

According to Louisiana Revised Statute (LA RS) 32:64[7], "General Speed Law,"

> *No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds established by this Chapter or regulation of the department made pursuant thereto.*

According to Louisiana Revised Statute (LA RS) 32:56[8], "Obedience to police officers, weights and standards police officers, and traffic signs,"

> *No person shall fail or refuse to comply with the instruction or direction of any traffic control device which has been erected under authority of this Chapter or other law of this state.*

---

[5] Uzgiris, S., Hales, C., Dilich, M.  (1997).  *Commercial Vehicle Preventable Accident Manual:  A Guide to Countermeasures*.  JJ Keller & Associates.  Neenah, Wi.  Pages 3, 22, 26, and 29.
[6] Driving on right side of road; exceptions, LA RS § 32:71 (2009)
[7]General speed law, LA RS § 32:64 (1983)
[8]Obedience to police officers, weights and standards police officers, and traffic signs, LA RS § 32:56 (1977)

According to Louisiana Revised Statute (LA RS) 32:58[9], "Careless Operation,"

> *Any person operating a motor vehicle on the public roads of this state shall drive in a careful and prudent manner, so as not to endanger the life, limb, or property of any person. Failure to drive in such a manner shall constitute careless operation.*

According to Louisiana Revised Statute (LA RS) 32:124[10], "Vehicle entering highway from private road, driveway, alley or building,"

> *The driver of a vehicle about to enter or cross a highway from a private road, driveway, alley or building, shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across any alleyway or driveway, and shall yield the right of way to any pedestrian as may be necessary to avoid collision, and shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard.*

Mr. Farris had a legal obligation to ensure he could enter onto the interstate safely and did so when approaching traffic was over 600ft or two football fields away. Meanwhile, Mr. Jefferson had the legal obligation to obey the speed limit and not use the left lane. Although failing to adhere to the reduced speed limit within the construction zone and illegally occupying the left lane, Mr. Jefferson did perceive and react to Mr. Farris's entry into the left lane and had ample distance and opportunity to avoid the collision. Mr. Jefferson was aware of Mr. Farris' dump truck, as indicated by the fact that he gradually reduced his speed with use of the Jake Brake. As a professional commercially-licensed driver, Mr. Jefferson should have been familiar with the handling characteristics afforded by his combination vehicle, including the amount of braking necessary to avoid hitting a slower moving vehicle ahead of him. Without exiting the left lane, Mr. Jefferson could have avoided the accident by simply applying the brake pedal at only a slightly higher (but still less than normal) rate than provided by the Jake Brake alone and avoided the collision.

## Conclusions

In summary, NCTI has formulated the following conclusions:
- The accident occurred at 1:21pm on I-10 East in Lafayette, LA.
- Weather conditions were clear, dry, and daylight.
- Mr. Farris, driving a Dump Truck, entered the left lane of I-10 East from an opening in the median barrier within a construction zone.
- There was an open sightline of approximately 2400ft.
- Mr. Jefferson was driving a Peterbilt 18-wheeler on I-10 East at 67 mph in the left lane.
- Mr. Jefferson passed signs warning that he had entered a construction zone, that the speed limit was 60mph, and that trucks should only use the right lane.
- Mr. Jefferson had been driving at 67mph for over a minute in the left lane when Mr. Farris entered I-10 East.
- Mr. Jefferson gradually reduced his speed, a less than normal braking rate of 0.15g.
- Mr. Jefferson's gradual reduction in speed was due use of the Jake Brake system alone.
- Mr. Jefferson crashed into the rear of Mr. Farris' Dump Truck at 35mph.
- Mr. Farris had reached approximately 32mph at impact.

---

[9] Careless Operation, LA RS § 32:58 (2014)
[10] Vehicle entering highway from private road, driveway, alley or building, LA RS § 32:124 (1962)

- Mr. Jefferson could have avoided the accident by applying normal braking, or even a slightly higher but still less than normal braking rate of 0.16g.
- Mr. Jefferson had ample time and distance to avoid the collision
- Mr. Farris failed to apply sufficient braking to avoid hitting Mr. Farris' Dump Truck.
- Mr. Jefferson violated LA RS 32:71, "Driving on right side of road; exceptions," by driving for an extended period in the left lane.
- Mr. Jefferson violated LA RS 32:64, "General Speed Law," driving at 67mph in a 60mph zone.
- Mr. Jefferson violated LA RS 32:56, "Obedience to police officers, weights and standards police officers, and traffic signs," by failing to comply with the instructions of the traffic control signs posted in the construction zone.
- Mr. Jefferson violated LA RS 32:58 "Careless Operation" for failing to maintain control of his vehicle.

These findings are based on currently available information.   The methodology and scientific principles employed in the reconstruction of the subject collision are based on my formal training and are accepted in the field of accident reconstruction.   In the event of trial, NCTI intends to present charts, tables, and/or graphs in addition to photographs and diagrams as exhibits and/or demonstrative aids.   A copy of my CV and testimony log is attached along with a summary of calculations expressed within this report.   NCTI reserves the right to conduct further studies should additional information become available at a later date.

I am the President and owner of National Collision Technologies, Inc., a Louisiana-based corporation, founded in 1993 and dba NCTI.   NCTI conducts technical investigations and reconstructs traffic collisions on a full-time basis.   I have been investigating traffic collisions since 1977 and performing formal accident reconstructions since 1991.   My training in the discipline of traffic accident reconstruction consists of over one thousand hours of formal tested courses.   As the founder and Supervisor of the Baton Rouge City Police Traffic Homicide Unit, I was responsible for the on-scene investigation and reconstruction of all critical injury and fatal collisions for the purpose of determining criminal negligence and providing expert testimony.   In addition, my responsibilities included: technical traffic investigations as requested by the Chief of Police, Internal Affairs, Parish and District Attorney, technical assistance to neighboring agencies and development of formal training for law enforcement.

To date, I have investigated over two thousand traffic collisions and have conducted formal reconstructions of over one thousand nine hundred additional collisions.   I have provided expert testimony in over four hundred cases and qualified as an expert in accident reconstruction and/or rules of the road in Local, District, Military and Federal courts in Louisiana and Mississippi as well as by the LA State Supreme Court.

Sincerely,

Michael S. Gillen
President & Testifying Expert

Michael A. Raymond
Senior Reconstruction Technician